IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | |
| Plaintiff, | |
| v. | No. |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | |
| Defendants. | |

## COMPLAINT

Plaintiff Wells Fargo Insurance Services USA, Inc. by and through its attorneys, McGuireWoods LLP, hereby files the following Complaint against the above-named Defendants.

## INTRODUCTION

1.     Plaintiff Wells Fargo Insurance Services, USA, Inc. (hereinafter "WFIS") is an insurance broker business with offices across the United States.  The insurance brokerage business is fundamentally a "relationship" business, in which WFIS must necessarily foster and promote close personal relationships between its employees who sell to and service WFIS's clients and the clients' owners, employees, and representatives.   WFIS invests substantial resources in maintaining these relationships and providing exemplary service. Critical to WFIS's business is the employment of Sales Executives who develop and maintain these client relationships.

1

2.      Defendants Sean Andreas, Zachary Mendelson, Charles Yorio, Phillip Wakim, Janice Zewe, Sally Krauss, Kurt Karstens, and Peter Kostorick (collectively, "Individual Defendants"), are all former WFIS sales executives, account executives, claims advisors, control managers or transactional employees.  Each former employee signed a version of an agreement designed to protect the relationships he or she developed for WFIS and protect WFIS's financial interests and business.

3.      To support their business efforts, Individual Defendants were provided access to WFIS's confidential and trade secret information, including marketing strategies, performance metrics, client contact information, and individualized client insurance needs and histories.

4.      Notwithstanding this access to information and continued support from WFIS, the Individual Defendants all elected to leave WFIS, *en masse*, to start the Pittsburgh office of Edgewood Partners Insurance Center ("EPIC").  Indeed, the Individual Defendants resignation letters were essentially uniform and showed the concerted nature of their conduct.

5.      The Individual Defendants efforts to undermine WFIS are overt.  They conspired prior to leaving to all resign at the same time and day allowing for a group of six (6) employees to depart at once.  The very next day a seventh employee joined EPIC, over the following two business days three additional employees resigned to join EPIC.  Upon information and belief, the Defendants are soliciting additional employees.

6.      Even more egregious, EPIC facilitated their departure through a concerted and unlawful effort, wherein EPIC raided WFIS of its talent and to exploit and ultimately convert WFIS's customer relationships and goodwill to EPIC by directly and purposefully interfering with the contractual obligations of the Individual Defendants which they owed and continue to owe to WFIS.

2

7.      Further, all of the conversations and assistance occurred while the Individual Employees were all still employed with WFIS, owed WFIS duties of loyalty and then, after their departure, were restricted through various contractual agreements.

8.      The Individual Defendants worked collaboratively as a team.  Sean Andreas Zachary Mendelson, Janice Zewe, Sally Krauss, Peter Kostorick, and Kurt Karstens served as Sales and/or Account Executives, acting as the face of the team and interacting with WFIS's customers.  The remainder of the Individual Defendants served a critical role in servicing WFIS's customers, including account management, customer interaction, claims, and continued attention to the customer relationship.

9.      Upon information and belief, the Individual Defendants began to plan their departure sometime in early 2017.  The Individual Defendants conspired to arrange for a departure *en masse* and then, on September 27, 2017, they collectively notified WFIS of their resignations. WFIS was subsequently notified of additional resignations on September 28, 2017, October 2, 2017 and October 3, 2017.

10.     Upon information and belief, EPIC had arranged to rent space in Oxford Center so that the Individual Employees could immediately begin to solicit WFIS's customers.  EPIC and the Individual Defendants established an EPIC Pittsburgh office – the office did not previously exist – with the clear intention of soliciting WFIS's customers, using WFIS's confidential customer information and working to undermine WFIS.

11.     Notwithstanding the Individual Defendants obligations to WFIS, the Individual Defendants have systematically broken their contractual promises to WFIS—with encouragement and assistance from EPIC—and inflicted significant damage and irreparable harm on the relationships between WFIS and its clients and employees. WFIS brings this claim to make this

3

illicit conduct end and to seek damages to remedy the losses incurred by the Individual Defendants'
and EPIC's illicit conduct.

12.     As of the filing of this Complaint, the Individual Defendants and EPIC have hired
roughly 25% of WFIS's employees who served over $4 million in client revenue.   WFIS has
received notice clients who have sent in their "Broker of Record" letters, indicating that they are
taking their business away from WFIS and moving it to EPIC.   In addition, WFIS has been
informed that several of the Individual Defendants – on behalf of EPIC – have solicited WFIS's
client.   Given their conduct to date, it is more than likely that the Defendants intend to directly
solicit more WFIS clients in violation of their Agreements, in violation of their Agreements, and
in contravention of their duties and common law.

13.     Finally, and perhaps most egregiously, the Individual Defendants are spreading
false information regarding the WFIS Pittsburgh office.   They have told customers that certain of
the employees have left WFIS when they know that is not true.   This dissemination of information
has been done for the sole purpose of undermining WFIS's business.

## PARTIES

14.     WFIS is a corporation organized and existing under the laws of the state of North
Carolina.

15.     Upon information and belief, Edgewood Partners Insurance Center is a foreign
corporation organized under the laws of the state of California with its corporate headquarters in
San Francisco, California.

16.     Defendant Sean Andreas was an employee of WFIS at WFIS Pittsburgh,
Pennsylvania branch office location.   Andreas is a resident of Allison Park, Pennsylvania.

17.     Zachary Mendelson was an employee of WFIS at WFIS's Pittsburgh, Pennsylvania branch office location.  Mendelson is a resident of Morgantown, West Virginia.

18.     Charles Yorio was an employee of WFIS at WFIS's Pittsburgh, Pennsylvania branch office location.  Yorio is a resident of Pittsburgh, Pennsylvania.

19.     Phillip Wakim was an employee of WFIS at WFIS's Pittsburgh, Pennsylvania branch office location.  Wakim is a resident of Bridgeville, Pennsylvania.

20.     Janice Zewe was an employee of WFIS at WFIS's Pittsburgh, Pennsylvania branch office location.  Zewe is a resident of Allison Park, Pennsylvania.

21.     Sally Krauss was an employee of WFIS at WFIS's Pittsburgh, Pennsylvania branch office location.  Krauss is a resident of Pittsburgh, Pennsylvania.

22.     Peter Kostorick was an employee of WFIS at WFIS's Pittsburgh, Pennsylvania branch office location.  Kostorick is a resident of Glenshaw, Pennsylvania.

23.     Kurt Karstens was an employee of WFIS at WFIS's Pittsburgh, Pennsylvania branch office location.  Karstens is a resident of Pittsburgh, Pennsylvania.

## JURISDICTION & VENUE

24.     Subject matter jurisdiction exists by virtue of diversity of citizenship, 28 U.S.C. §1332.  The matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, and there is complete diversity of citizenship.  Injunctive relief is sought pursuant to Federal Rule of Civil Procedure 65.

25.     Venue is proper in this judicial district under 28 U.S.C. § 1391(a) because it is the district in which the conduct complained of arose.

## FACTS

26.     WFIS is a non-bank insurance agency affiliate of Wells Fargo & Company. WFIS has a branch office in Pittsburgh, Pennsylvania.

27.     WFIS has been providing insurance services to its clients since 1903.  Since that time, WFIS invested substantial time, effort, money, and resources into creating and maintaining its relationships with its customers.

28.     WFIS strives to provide all of its existing and prospective insurance accounts superior service.  To meet that goal, WFIS employs and trains its staff, and in particular its sale and sales servicing staff, in the unique business model WFIS has developed over many years.  Among other things, that model requires WFIS to promote and foster the development of close personal relationships between its sales and support staff and its clients, and to provide its employees with unfettered access to WFIS's confidential trade secrets and customer information.

29.     A key and principal part of WFIS's business is providing insurance products and services that are unique to the particular needs and specifications of its customers.  Information concerning WFIS's customers and the details of their insurance needs and policies, including but not limited to non-public internal procedures, programs, and forms, non-public lists of prospective and insured customers, non-public information compiled on behalf of WFIS regarding such facts as habits and insurance needs of customers and prospective customers, locations and descriptions of insured properties or properties proposed to be insured, expiration dates of insurance policies,

and insurance daily reports (hereinafter, "Confidential Information"), is considered and treated as highly confidential within WFIS and is not shared with anyone outside of the Company.

30.     WFIS has developed and maintained its Confidential Information through considerable expenditure of time, effort, and expense.

31.     In addition to the time, effort, and money spent to develop this Confidential Information, WFIS has also expended significant time, effort, and money to develop relationships with its customers; to learn the particular insurance needs, specifications, and requirements of its customers; to develop substantial contacts and goodwill with customers; and to market and sell its insurance products and services to those customers.

32.     WFIS considers and treats all of its Confidential Information as having substantial competitive value to the Company.

33.     WFIS's Confidential Information is neither generally known nor readily ascertainable by proper means from publicly available sources; is related directly to and used by WFIS's business; and provides WFIS with a competitive advantage over those who do not know this information.  The possession of WFIS's Confidential Information would give competitors, particularly companies like EPIC that compete directly with WFIS by providing similar insurance brokerage services in the same area as WFIS, an unfair economic advantage in developing, marketing, brokering, and selling competitive insurance services and products.

34.     As such, WFIS uses reasonable and diligent efforts to protect and keep secret its Confidential Information.  These efforts include, but are not limited to, prohibiting access to the information by the general public; requiring employees to sign confidentiality agreements; limiting general employee access to the information; instructing employees not to share the information with competitors; and restricting access to its Confidential Information to WFIS employees who

agree to maintain its confidentiality and to use the Confidential Information only for the benefit of WFIS.

35.    In express recognition of the legally protected interest WFIS has in the Confidential Information it owns, and in light of the vulnerable position posed by WFIS's need to foster close personal relationships between its employees and its clients, each of the Individual Defendants have entered into some variation of a written agreement regarding trade secrets, confidential information, and non-solicitation of employees or clients. Copies of each of their agreements are attached hereto as exhibits, and are incorporated herein by reference.

36.    WFSI has adopted its Code of Ethics and Business Conduct (the "Code"), which all employees agree to as a condition of employment.

37.    The Confidential Information section of the Code protects WFIS's interest in information relating to its customers:

> Each of us has access to confidential information about Wells Fargo, our customers, team members, and our third-party service providers. We are responsible for keeping confidential information safe and secure. Always remember [u]se confidential information only for legitimate Wells Fargo business purposes and not for your personal gain or to compete with Wells Fargo. Protect confidential information you acquire through your employment or service with Wells Fargo in accordance with Information Security Policy standard. Never discuss confidential information when others might be able to overhear you. Customer information requires special care – do not disclose it to anyone outside Wells Fargo except when required by law, or in accordance with our privacy policies and customer agreements. Keep team members' and customers' personal information safe and secure and only share it with those who have a legitimate Wells Fargo business need to know.

(Code p.9.  A true and correct copy of pertinent portions of the Code is attached as Exhibit A, along with all Individual Defendants' signed acknowledgement that they are bound by it.)

38.    The Codes Proprietary Information section defines propriety information as including information that is unique to WFIS and is shared only based on distinct business need to

know, including customer lists, technical data, product costs, and trade secrets.   The Code makes clear that "[c]ompromise of proprietary information would impact WFIS's ability to compete." (Code p.22).

39.     In addition to WFIS's efforts relating to customer information, WFIS works hard to recruit top-level talent.  WFIS works to train its employees and retain their talents as employees are the lifeblood of WFIS's business and ongoing success.

***Andreas, Mendelson, Yorio's, and Karstens' Contractual Obligations to WFIS & Resignations***

40.     On December 17, 2009, Andreas signed the Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, and Assignment of Inventions ("Non-Solicitation Agreement"), in consideration of continued employment with Wells Fargo and his ability to "participate in a new compensation plan containing new and additional benefits which include, but are not limited to, a guaranteed draw and an increased commission percentage for new revenue and net new revenue generated in 2010…" (a true and correct copy is attached hereto as Exhibit B). (See Exhibit B, § I).

41.     At the time of his resignation, Andreas was a WFIS Sales Executive who interfaced directly with WFIS's clients.

42.     Mendelson signed the Non-Solicitation Agreement on August 1, 2011. A true and correct copy of the Non-Solicitation Agreement is attached hereto as Exhibit C.

43.     The consideration, in part, received by Mendelson was his continued employment and participation in the WFIS compensation plan.  As stated in the Non-Solicitation Agreement, in consideration for being "employed and compensated by Wells Fargo." (Exhibit C, § I)

44.     At the time of his resignation, Mendelson was a WFIS Sales Executive who interfaced directly with WFIS's clients.

45.    Yorio signed his Non-Solicitation Agreement on November 17, 2014.  A true and correct copy of the Non-Solicitation Agreement is attached hereto as Exhibit D.

46.    The consideration, in part, received by Yorio was his continued employment and participation in the WFIS compensation plan.   As stated in the Non-Solicitation Agreement, in consideration for being "employed and compensated by Wells Fargo." (Exhibit D, § I)

47.    At the time of his resignation, Yorio was a WFIS control manager who worked directly with clients to help to improve their account services.

48.    Under their respective Non-Solicitation Agreements, Andreas, Mendelson, and Yorio made a number promises to protect WFIS' business interests, trade secrets and confidential information.  Among other things, they promised that for a period of two (2) years immediately following termination or resignation of their employment for any reason,  they would not do any of the following, directly, or indirectly or through associates, agents, or employees:

(a) **solicit, recruit, or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services**;

(b) **solicit, participate in, or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services** ("Competitive Products/Services").  "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, services, or further the business relationship; or

(c) **accept insurance business from or provide Competitive Products/Services to customers or clients of the Company: (i) with whom I had Material Contact and/or, (ii) were clients or customers of the Company within six (6) months prior to my termination of employment**.

(Exhibits B § III, C § III, and D § III)(emphasis added).

49.     Additionally, the Non-Solicitation Agreement contains covenants that prohibit Andreas, Mendelson, and Yorio, both during and after their employment at WFIS, from divulging, using, or disclosing any of the Company's Trade Secrets and Confidential Information, including, but not limited to, the names, addresses, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, policies, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies, and objectives.

50.     Further, Andreas, Mendelson, and Yorio agreed that the breach of the Non-Solicitation Agreement would irreparably harm WFIS, stating:

> "Recognizing the irreparable nature of the injury that could be done by violation of this Agreement and that money damages would be inadequate compensation to the Company, it is agreed that any violation of this Agreement by me should be proper subject of immediate injunctive relief, specific performance and other equitable relief to the Company.  I further agree to communicate the contents of this section and the non-disclosure sections of this Agreement to any prospective employer."

(Exhibits B, §VII, C §VII, and D §VII ).

51.     The Non-Solicitation Agreement requires Andreas, Mendelson, and Yorio to "communicate the contents of this section and the non-solicitation and non-disclosure sections of this Agreement to any prospective employer," such as EPIC.  (Exhibit B, §VII, C §VII, and D §VII).

52.     Upon information and belief, prior to Andreas, Mendelson, and Yorio resigning from WFIS, they provided EPIC with their Non-Solicitation Agreements.

53.     At some time prior to September 27, 2017 - and while still employed by WFIS – Andreas, Mendelson, and Yorio recruited and/or approached at least four (4) other account executives and employees in the WFIS Pittsburgh office to join their plan to raid WFIS, misappropriate WFIS's insurance business and to help establish and join EPIC's newest branch office in Pittsburgh.  All of this was done with the intent to undermine WFIS, steal WFIS' business and cripple WFIS' Pittsburgh office.  Specifically, upon information and belief, Andreas, Mendelson, and Yorio either directly or indirectly, in violation of their Non-Solicitation Agreements, recruited these persons because of their close relationships with WFIS insurance accounts and the clients they serviced.

54.     Andreas, Mendelson, and Yorio recruited the account executives and employees despite knowledge that they also had written employment agreements with WFIS or its predecessor.  They likewise knew about the contractual arrangements of the other Individual Defendants and, notwithstanding that knowledge, elected to tortiously interfere with the contractual agreements.

55.     Andreas, Mendelson and Yorio induced and encouraged each other and these persons to join EPIC and breach their contractual obligations to WFIS for the unlawful purpose of misappropriating WFIS insurance business from WFIS.

56.     On September 27, 2017, Andreas, Mendelson, and Yorio submitted their resignation, together with the resignation of three (3) other WFIS account executives they had recruited.  Andreas, Mendelson, and Yorio intended this concerted conduct to cause substantial damage to the WFIS Pittsburgh office and its ability to conduct business.

57.     Andreas, Mendelson, and Yorio subsequently joined EPIC - a direct competitor of WFIS – to establish a new branch location in Pittsburgh, Pennsylvania.

58.     Upon information and belief, Andreas is now a Principal, or otherwise employed and affiliated with EPIC, in a role that is substantially identical to his recent role at WFIS. In particular, Andreas continues his specialty of representing and advising clients with all of their insurance and risk management needs. He will do so by capitalizing on the relationships that Andreas gained and developed with WFIS's customers while working for WFIS.

59.     Upon information and belief, Mendelson is now a Principal, or otherwise employed and affiliated with, EPIC in a role that is substantially identical to his recent role at WFIS.  In particular, Mendelson continues his specialty of representing and advising clients in the field of surety bonds and commercial insurance.  He will do so by capitalizing on the relationships that Mendelson gained and developed with WFIS's customers while working for WFIS.

60.     Upon information and belief, Yorio is an employee for, or otherwise affiliated with EPIC, in a role that is substantially identical to his recent role at WFIS. In particular, Yorio continues his specialty of representing and advising clients in risk control, particularly in the construction and manufacturing industries.  He will do so by capitalizing on the relationships that Yorio gained and developed with WFIS's customers while working for WFIS.

61.     Upon Andreas, Mendelson, and Yorio's resignations, WFIS hand-delivered letters reminding Andreas, Mendelson, and Yorio of their contractual obligations to WFIS under their respective Non-Solicitation Agreements, including their obligations not to solicit WFIS customers; their duties not to request, advise, or induce any WFIS customer or prospective customer to cancel, curtail, or otherwise change such business relationship; their duty to keep WFIS confidential information and trade secrets confidential, and their duties not to induce any employee or consultant to leave WFIS's employ.

62.     Andreas, Mendelson, and Yorio ignored and disregarded their contractual promises to WFIS.  While employed at WFIS, Andreas, Mendelson, and Yorio solicited WFIS employees to join them at EPIC and to leave WFIS's employ.

63.     Immediately, on the morning of September 28, 2017, less than twenty-four (24) hours from WFIS receiving Andreas, Mendelson, and Yorio's resignations, the WFIS Pittsburgh office had begun to receive communications from customers regarding the departures of employees.

64.     As of October 4, 2017, WFIS had received the resignations of six (6) *additional* employees who have all left to join Andreas, Mendelson, and Yorio at EPIC.

65.     In addition, the ongoing contractual interference continues.  Upon information and belief, Andreas, Mendelson and Yorio have worked with EPIC to recruit additional WFIS employees.

66.     Specifically, on October 2, 2017, an additional WFIS sales executive, Karstens, resigned his position with WFIS along with Kathryn Findlay.  Both joined EPIC.

67.     On October 3, 2017, Amy Zgorliski resigned her position with WFIS to join EPIC.

68.     Karstens executed an agreement on December 17, 2009 wherein he agreed to the same terms as Andreas, Mendelson, and Yorio.  (Exhibit E § III).

69.     On October 2, 2017, upon learning of Karstens' resignation, WFIS hand-delivered a letter reminding him of his contractual obligations to WFIS under his Non-Solicitation Agreement, including his obligation not to solicit WFIS customers; his duty not to request, advise, or induce any WFIS customer or prospective customer to cancel, curtail, or otherwise change such business relationship; his duty to keep WFIS confidential

information and trade secrets confidential, and his duty not to induce any employee or consultant to leave WFIS's employ

70.     Upon information and belief, Andreas, Mendelson and Yorio directly or indirectly contacted Karstens in violation of their respective Non-Solicitation Agreements.

71.     Upon information and belief, Andreas, Mendelson, Yorio and Karstens are also working to recruit additional WFIS employees.  In furtherance of that effort, they are working in concert with EPIC and a recruiter EPIC retained, to directly contact WFIS employees on their personal email addresses.

72.     Upon information and belief, Andreas, Mendelson, Yorio, and Karstens are facilitating these conversations through the provision of employee information and are using a recruiter as a means to systematically avoid their restrictive covenant obligations.  Notwithstanding that effort, their conduct at a minimum violates their restrictive covenant agreement not to solicit or recruit "indirectly" or through "associates, agents, or employees."

73.     Andreas, Mendelson, and Yorio also were aware that Zewe, Krauss, and Kostorick, as set forth below, had restrictive covenants not to solicit current WFIS employees, yet, notwithstanding that knowledge, they elected to tortiously interfere with WFIS contractual rights when they assisted in the solicitation of WFIS employees.

### *Wakim's Contractual Obligation & Resignation*

74.     As part of, and in consideration of, his offer of employment, Wakim signed a Non-Disclosure and Anti-Piracy Agreement ("Anti-Piracy Agreement"). This agreement is between Wakim and Acordia of Pennsylvania, Inc. ("Acordia"). Subsequent to the execution of the Anti-Piracy Agreement, Acordia was acquired by WFIS and WFIS acquired and was assigned Acordia's

rights under the Anti-Piracy Agreement.  A true and correct copy of the Anti-Piracy Agreement is attached hereto as Exhibit F.

75.     Under the Anti-Piracy Agreement, Wakim made a number of agreements to protect Acordia's (and now WFIS's) business interests, trade secrets and confidential information. Among other things, Wakim acknowledged agreed that in the event of his resignation he would "**not for a period of two years from the date of the resignation, directly or indirectly**, either individually or as a principal, partner, agent, employee or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, except on behalf of Acordia **solicit or accept insurance clients from any customer or prospect serviced or developed by the employee during the course of his/her normal business responsibilities with Acordia, or was such an insurance client of Acordia within the 12 month period prior to the employee's termination of Acordia."** (Exhibit F, ¶ 2)(emphasis added).

76.     Additionally, the Agreement contains covenants that prohibit Wakim, both during and after his employment at WFIS, from divulging, using, or disclosing any of the Company's Trade Secrets and Confidential Information, including, but not limited to, the names, addresses, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, policies, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies, and objectives.  (Exhibit F, ¶ 1)

77.     In addition, Wakim agreed that "money damages are not an adequate remedy for any breach of this Agreement and therefore in the event of a threatened breach by

Employee of the foregoing provisions of this agreement, Acordia shall be entitled to an injunction restraining Employee from the commission of such breach." (Exhibit F, ¶ 3).

78.     On September 27, 2017, Wakim resigned from WFIS.  Wakim subsequently joined EPIC, a direct competitor of WFIS.

79.     Upon information and belief, Wakim is an employee for, or otherwise affiliated with, EPIC in a role that is substantially identical to his recent role at WFIS. In particular, Wakim continues his specialty as an insurance claims advisor and broker.  He will do so by capitalizing on the information gained and relationships developed with WFIS's customers while Wakim was working for WFIS.

80.     Upon Wakim's resignation, in a hand-delivered letter, WFIS reminded Wakim of his contractual obligations to WFIS under the Anti-Piracy Agreement, including his obligation not to solicit WFIS customers and his duty to keep WFIS confidential information and trade secrets confidential.

81.     Upon information and belief, Wakims is aware of his co-defendants Non-Solicitation Agreements, including their obligations not to solicit WFIS employees. Notwithstanding that knowledge, Wakims has conspired with Andreas, Mendelson, Yorio, Zewe, Krauss, Kostorick, and Karstens to breach the Non-Solicitation Agreements and solicit employees of WFIS.

### *Zewe and Krauss's Contractual Obligations & Resignations*

82.     As part of, and in consideration of, her offer of employment, Zewe signed an Employment Agreement.  This agreement is between Zewe and Acordia of Pennsylvania, Inc. ("Acordia"). Subsequent to the execution of the Employment Agreement, Acordia was acquired

by WFIS and WFIS acquired Acordia's rights under the Employment Agreement.   A true and correct copy of her Employment Agreement is attached hereto as Exhibit G.

83.     As part of, and in consideration of, her offer of employment, Krauss signed an Employment Agreement.  This agreement is between Krauss and Acordia of Pennsylvania, Inc. ("Acordia").  Subsequent to the execution of the Employment Agreement, Acordia was acquired by WFIS and WFIS acquired Acordia's rights under the Employment Agreement.   A true and correct copy of Krauss's Employment Agreement is attached hereto as Exhibit H.

84.     In both of their Employment Agreements, Zewe and Krauss made a number of agreements to protect WFIS's business interests, trade secrets and confidential information. Among other things, they agreed not disclose to any person or entity not associated with WFIS any business, financial, or other confidential and/or proprietary information of WFIS and/or its customers, clients or insureds.  (Exhibits G, ¶ 8(a), H, ¶ 8(a)).

85.     Zewe and Krauss agreed to promptly reveal to management all matters coming to either of their attention pertaining to the business or interest of WFIS. (Exhibits G ¶ 8(b), H, ¶8(b)).

86.     Zewe and Krauss agreed not to raid WFIS's customers, agreeing that for a period of two (2) years after their resignation they would not:

> "on her own behalf or on behalf of any other person, firm, corporation, association or other entity, either directly or indirectly, solicit, sell, service, create, manage or implement any kind of service or product offered by Employer to any person, company, firm or corporation:
> (1) who is a client, customer or insured of Employer at the time Employee's employment with Employer is terminated;
> (2) who was a client, customer, or insured of Employer at the time within the two (2) year period immediately preceding Employee's termination; or
> (3) whom Employee called upon while in the employ of Employer as a prospective client, customer or insured during the two (2) year period immediately preceding the termination of Employee's employment.

(Exhibits G, ¶ 8(d), H, 8¶(d)).

87.    Further agreeing not to raid WFIS employees, Zewe and Krauss agreed that:

(e) **For a period of two (2) years after Employee's employment relationship with Employer has terminated** for any reason, regardless of whether the termination was initiated by Employer or by Employee, **Employee shall not, on Employee's own behalf or on behalf of any other person, corporation or entity, either directly or indirectly, solicit, induce, recruit or cause another person in the employ of Employer to terminate his or her employment for the purpose of joining, associating, or becoming an employee with any business which is in competition with any business of activity engaged in by Employer.**

Both Employer and Employee agree that this Agreement does not prohibit Employee from leaving Employer and working directly or indirectly for a competitor or from forming a business in the same industry, so long as Employee honors the terms and conditions of this Agreement.

 (Exhibits G, ¶ 8(e), H, ¶8(d))(emphasis added).

88.    Zewe and Krauss recognized and agreed that a breach of the obligations and conditions set forth in the agreement will irreparably harm and damage Employer and that an award of money damages may not be adequate to remedy such harm, thus agreeing that WFIS "shall be entitled to both a preliminary and/or permanent injunction in order to prevent the continuation of such harm; to recover money damages, insofar as they can be determined, including, without limitation, all costs and attorney's fees incurred by Employer in enforcing the provisions of this Agreement."

(Exhibits G, ¶ 8(e), H, ¶ 8(e)).

89.    At some time prior to September 27, 2017 – and while still employed by WFIS – Zewe and Krauss recruited, with the assistance of Andreas, Mendelson, Yorio and Karstens, WFIS employees to join their plan to misappropriate WFIS's insurance business, to help establish and join EPIC's newest branch office in Pittsburgh, and to directly compete with WFIS for its insurance business. Zewe and Krauss recruited these persons because of their

close relationships with WFIS insurance account and the clients they serviced. Zewe and Krauss likewise knew that Andreas, Mendelson, Yorio and Karstens had Non-Solicitation Agreements and, notwithstanding that knowledge, tortiously interference with WFIS contractual rights when they assisted in the solicitation of WFIS employees.

90.     Zewe and Krauss recruited the account executives and employees despite knowledge that they also had written employment agreements with WFIS or its predecessor.

91.     Zewe and Krauss induced and encouraged these persons to join EPIC and breach their contractual obligations to WFIS for the unlawful purpose of misappropriating WFIS insurance business from WFIS.

92.     On September 27, 2017, Zewe and Krauss submitted their resignations, together with the resignation of four (4) other WFIS account executives and employees they had recruited to join them.  Zewe and Krauss intended this concerted conduct to cause substantial damage to the WFIS Pittsburgh office and its ability to conduct business.

93.     Zewe and Krauss subsequently joined EPIC - a direct competitor of WFIS – to establish a new branch location in Pittsburgh, Pennsylvania.

94.     Upon information and belief, Zewe is a Principal, or otherwise employed and affiliated with EPIC, in a role that is substantially identical to her recent role at WFIS. In particular, Zewe continues her role as a commercial account sales executive, specifically continuing her specialty of representing and advising clients in the field of property and casualty insurance and group captive insurance. She will do so by capitalizing on the relationships that Zewe gained and developed with WFIS's customers while working for WFIS.

95.     Upon information and belief, Krauss is a Principal, or otherwise employed and affiliated with EPIC, in a role that is substantially identical to her recent role at WFIS. In particular,

Krauss continues her role as a commercial account sales executive, specifically continuing her specialty of representing and advising clients in the field of property and casualty insurance. She will do so by capitalizing on the relationships that Krauss gained and developed with WFIS's customers while working for WFIS.

96.     Upon Zewe and Krauss's resignations, in a hand-delivered letter, WFIS reminded Zewe and Krauss of their contractual obligations to WFIS under their respective Employment Agreements, including their obligation not to solicit WFIS customers; their duty not to request, advise, or induce any WFIS customer or prospective customer to cancel, curtail, or otherwise change such business relationship; their duty to keep WFIS confidential information and trade secrets confidential, and their duty not to induce any employee or consultant to leave WFIS's employ.

97.     Zewe and Krauss ignored and disregarded their contractual promises to WFIS. Zewe and Krauss have solicited WFIS employees to join them at EPIC and to leave WFIS's employ.

98.     Zewe and Krauss also were aware that Andreas, Mendelson, Karstens, Yorio, and Kostorick, as set forth above and below, had restrictive covenants not to solicit current WFIS employees, yet, notwithstanding that knowledge, they elected to tortiously interfere with WFIS contractual rights when they assisted in the solicitation of WFIS employees.

99.     As of October 4, 2017, WFIS had received the resignations of eight additional employees who have all left to join Zewe and Krauss at EPIC.

### *Kostorick's Contractual Obligations & Resignation*

100.     As part of his offer of employment, Kostorick signed an Agreement Regarding Trade Secrets, Confidential Information and Non-Solicitation ("Kostorick Agreement") in

21

November 2006. This agreement is between Kostorick and Acordia Northeast, Inc. (PA) ("Acordia"). Subsequent to the execution of the Kostorick Agreement, Acordia was acquired by WFIS and WFIS acquired Acordia's rights under the Non-Solicitation Agreement.  A true and correct copy of the Non-Solicitation Agreement is attached hereto as Exhibit I.

101.    Under the Kostorick Agreement, Kostorick made a number of agreements to protect WFIS's business interest, trade secrets and confidential information. Among other things, he promised that for a period of two (2) years following termination of his employment with Acordia for any reason he would not "**interfere with Acordia's business by directly or indirectly soliciting an employee to leave Acordia's employ, by inducing a consultant to sever the consultant's relationship with Acordia, or by soliciting business from any of Acordia's Customers or Potential Customer."**  (Exhibit I, § III)(emphasis added).

102.    Additionally, the Agreement contains covenants that prohibit Kostorick, both during and after his employment at WFIS, from divulging, using, or disclosing any of the Company's Trade Secrets and Confidential Information, including, but not limited to, the names, addresses, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, policies, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies, and objectives.

103.    Further, Kostorick agreed that the breach of the Kostorick Agreement would irreparably harm WFIS that "money damages would be inadequate compensation to the Company," and he agreed that "any violation of this Agreement by me should be proper subject

of immediate injunctive relief, specific performance and other equitable relief to the Company." (Exhibit I, § IX).

104.    The Kostorick Agreement requires Kostorick to "communicate the contents of this section and the non-solicitation and non-disclosure sections of this Agreement to any prospective employer," such as EPIC.  (Exhibit I, §IX.)  Upon information and belief, Kostorick complied with this contractual obligation.

105.    At some time prior to September 27, 2017 – and while still employed by WFIS – Kostorick recruited and/or approached WFIS employees to misappropriate WFIS's insurance business, to help establish and join EPIC's newest branch office in Pittsburgh, and to directly compete with WFIS for its insurance business.  Kostorick recruited these persons because of their close relationships with WFIS insurance account and the clients they serviced.

106.    Kostorick recruited the employees despite knowledge that they also had written employment agreements with WFIS or its predecessor.

107.    Kostorick induced and encouraged these persons to join EPIC and breach their contractual obligations to WFIS for the unlawful purpose of misappropriating WFIS insurance business from WFIS.

108.    On September 28, 2017, Kostorick submitted his resignation, just one day after six other WFIS employees submitted theirs.  Kostorick intended this concerted conduct to cause substantial damage to the WFIS Pittsburgh office and its ability to conduct business.

109.    Kostorick subsequently joined EPIC - a direct competitor of WFIS – to establish a new branch location in Pittsburgh, Pennsylvania.

110.    Upon information and belief, Kostorick is an employee for, or otherwise affiliated with EPIC, in a role that is substantially identical to his recent role at WFIS. In particular,

Kostorick continues his specialty of representing and advising clients with their property and casualty insurance business needs.  He will do so by capitalizing on the relationships that Mendelson gained and developed with WFIS's customers while working for WFIS.

111.   Upon Kostorick's resignation, in a hand-delivered letter, WFIS reminded Kostorick of his contractual obligations to WFIS under the Non-Solicitation Agreement, including his obligation not to solicit WFIS customers; his duty not to request, advise, or induce any WFIS customer or prospective customer to cancel, curtail, or otherwise change such business relationship; his duty to keep WFIS confidential information and trade secrets confidential, and his duty not to induce any employee or consultant to leave WFIS's employ.

112.   Kostorick ignored and disregarded his contractual promises to WFIS. Kostorick has solicited and continues to solicit WFIS employees to join him at EPIC and to leave WFIS's employ or sever their consultant relationships with WFIS.

113.   Kostorick also was aware that Andreas, Mendelson, Yorio, Zewe, Krauss, and Karstens, as set forth above, had restrictive covenants not to solicit current WFIS employees, yet, notwithstanding that knowledge, they elected to tortiously interfere with WFIS contractual rights when they assisted in the solicitation of WFIS employees.

114.   As of October 4, 2017, WFIS had received the resignations of a total of ten  (10) employees who have all left to form EPIC's Pittsburgh office.

### The Individual Defendants Pre-Resignation Competition and Conspiracy, Coordinated Resignations, and Immediate Employment with EPIC

115.   Upon information and belief, the Individual Defendants initially planned to join EPIC in early 2017.  But, notwithstanding their desire to leave WFIS, they remained employed until they resigned beginning on September 27, 2017, delaying their resignations to allow for EPIC to help facilitate office space and allow the Individual Defendants to immediately solicit

WFIS employees and customers.  At that time, they resigned *en masse* in an effort to cripple WFIS's Pittsburgh office.

116.    Additional employees are now joining them, with two additional employees resigning as of October 2, 2017 and a third resigning on October 3, 2017.

117.    Upon information and belief, prior to their resignations, the Individual Defendants met and agreed to uniformly resign *en masse*, including working directly with EPIC to facilitate their departure from WFIS and begin their employment with EPIC.  Upon information and belief, EPIC leased space in Pittsburgh for the Individual Defendants, created EPIC email addresses for the Individual Defendants, provided the Individual Defendants with access to EPIC's systems and facilitated their pre-planned departure from WFIS to EPIC.

118.    For example, Sean Andreas changed his Linkedin.com profile to identify himself a "Principal at EPIC Insurance Brokers and Consultants" and stating that he was "excited to announce that effective today I have joined EPIC Insurance Brokers & Consultants ("EPIC") as a Principal in its Pittsburgh, Pennsylvania office where I will continue practicing my specialty of representing and advising clients with all of their insurance and risk management needs."  He also listed his cellular telephone number along with his EPIC email address, sean.andreas@epicbrokers.com.

119.    This conduct had the desired effect.  On September 28, 2017, a WFIS's customer reached out to Sean Andreas and stated that he had "found out you no longer worked for Wells Fargo . . . . Consequently, we would like to transfer to your new Company – EPIC Insurance Brokers Consultants.

120.    It is not known whether Andreas has accepted this business; however, if Andreas elects to do so he will be in direction violation of his Non Solicitation Agreement which provides

that Andreas will not "accept insurance business from or provide Competitive Products/Services to customers or clients of the Company: (i) with whom I had Material Contact and/or, (ii) were clients or customers of the Company within six (6) months prior to my termination of employment. *See* (Exhibits B § III)

121.    Upon information and belief, the remaining Individual Defendants likewise changed their Linkedin.com profiles to list their new positions and EPIC specific email addresses.

122.    The intent of this is clear – the Individual Defendants are informing the marketplace that they have moved and they are soliciting the insurance contacts they made while employed at WFIS to leave WFIS and follow them to EPIC.

123.    The intent has also had the desired effect, including, potentially, directly contacting WFIS's customers.

124.    After the Individual Defendants resignations, WFIS began to receive letters seeking to appoint EPIC as their exclusive insurance broker.  Again, these are clients of WFIS and the Individual Defendants acceptance of this business directly violates their contractual obligations to WFIS.

125.    Upon information and belief, the remaining Individual Defendants and EPIC are assisting with this breach, either directly or indirectly, all while having knowledge of Andreas' contractual restrictions.

126.    In addition, the Individual Defendants are working hand-in-hand with EPIC in an effort to surreptitiously evade their contractual arrangements.  For example, EPIC has retained a recruiter, Bryan Blakeman of HCI Integration Solutions, who is working with EPIC's Executive

Vice President, General Counsel, and Human Resources, to solicit WFIS employees through their personal telephones and email addresses to recruit them to join EPIC.

127.   Upon information and belief, the Individual Defendants have provided the personal telephone and email addresses so that EPIC can directly contract them, which conduct is an indirect violation of the non-solicit of employee restrictions.

128.   EPIC has knowledge of the Individual Employees restrictive covenants, yet is working with those employees through the retention of a recruiter to directly solicit WFIS employees.

129.   WFIS's outside counsel sent EPIC copies of each letter reminding the Individual Defendants of their respective contractual obligations to WFIS, thus putting EPIC on notice of the contractual obligations each Individual Defendant owed to WFIS.

130.   EPIC and the Individual Defendants' raid on WFIS is ongoing.  They continue to contact employees and are working to destroy a competitor and tortiously interfere with contractual agreements.

131.   The harm goes beyond just the poaching of the WFIS's employees.  WFIS has received copies of communications that the Individual Defendants and Epic have to WFIS's customers notifying those customers that the Individual Defendants were leaving WFIS and promoting EPIC as a "full-service" brokerage firm.

132.   Illustrating this point is on October 4, 2017, WFIS was informed that one of its current clients was specifically solicited by Mendelson as an agent of EPIC after his resignation.  In his solicitation, Mendelson wrote:

> "I am very excited to announce that I have joined EPIC Insurance Brokers & Consultants ("EPIC") as a Principal in its Pittsburgh, Pennsylvania office where I will continue practicing my specialty of representing and advising clients in the field of surety, commercial insurance and captive insurance programs.  EPIC is a full-service

national commercial and personal lines insurance brokerage firm specializing in employee benefits, property and casualty, management liability, cybersecurity and other insurance for businesses and individuals engaged in manufacturing, construction, design professional, legal, financial services, and transportation. Established in 2007, EPIC has in ten years grown to become among the nation's top 20 largest insurance brokers. EPIC's national team of 1,200 + professionals and customer service staff have consistently recognized EPIC as a "Best Place to Work" in multiple regions and as a "Best Place to Work in the Insurance Industry" nationally. More about EPIC can be found at www.epicbrokers.com. My contact information is below should you have any questions of me.

133.   Yorio, Zewe, Wakim have likewise sent emails to customers all notifying them to contact EPIC for further information and providing their new contact information. Upon information and belief, the remaining Individual Defendants have sent similar emails. Such solicitations indicate a coordinate, pre-planned agreement among the Defendants to solicit the business both before and immediately after they resigned from WFIS.

*Injunctive Relief Needed*

134.   Defendants have profited, and will have profited, from their unlawful actions at WFIS's expense, earning commission and fees that would otherwise have naturally and probably come to WFIS, by the time of trial herein.

135.   WFIS has been and continues to be damaged by Defendants acts described above in an amount to be proven at trial.

136.   Defendants have by their conduct, actions, and/or inactions manifested the intention to continue violation of the terms of the properly executed, valid and enforceable Employment and Non-Solicitation Agreements to which the Individual Defendants agreed, all to the immediate detriment of WFIS.

137.   WFIS has a clear and legal and equitable right to enforce the provisions of their various agreements, to protect its proprietary business information and to protect its business interest.

138.    WFIS has a well-grounded fear of actual present and future violations of the Employment and Non-Solicitation Agreements and derogation of its confidential information and trade secrets by the Defendants' conduct and actions to date.

139.    If the Defendants' conduct and actions continue unrestrained, WFIS will suffer additional harm and lose the benefit of its rights under its various employment agreements.

140.    By the terms of the written agreements, and as a matter of equity, a meaningful remedy available to WFIS is for the Court to enjoin Defendants for a period running two (2) years from the date of its Order, from directly or indirectly soliciting or inducing any of WFIS's remaining employees to leave the employ of WFIS; from directly or indirectly soliciting, participating in or promoting the solicitation of any of WFIS's clients, customers, or prospective customers with whom Individual Defendants had Material Contact and/or regarding whom Individual Defendants received Confidential Information, for the purpose of providing products or services that are in competition with WFIS's products or services; and from otherwise utilizing or disclosing trade secrets and other confidential and proprietary information of WFIS for any purpose other than that of conducting business on behalf of WFIS.

## CAUSES OF ACTION

## COUNT ONE - PERMANENT INJUNCTION

141.    WFIS re-alleges and incorporates the preceding paragraphs by reference herein with the same force and effect as if set forth in full below.

142.    Defendants' conduct, as described herein, is unlawful and has caused, and continues to cause, WFIS irreparable harm.

143.    Money damages would be difficult to compute and would be inadequate to compensate WFIS for this harm.

144.    All Individual Defendants have recognized and agreed, as part of their Employment or Non-Solicitation Agreements, that their breaches of their agreements will result in irreparable injury to WFIS, that money damages would be inadequate compensation to WFIS, and that any violation of their agreements are the proper subject for immediate injunctive relief, specific relief, and other equitable relief.

145.    EPIC is aware of the Individual Defendants Employment or Non-Solicitation Agreements and, notwithstanding that knowledge, is assisting the Individual Defendants to violate the terms of those agreements.

146.    WFIS is therefore entitled to a permanent injunction enjoining the Individual Defendants.

### COUNT TWO - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND CONTRACTUAL EXPECTANCY (AGAINST ALL DEFENDANTS)

147.    WFIS re-alleges and incorporates the preceding paragraphs by reference herein with the same force and effect as if set forth in full below.

148.    Before their resignations, each of the Individual Defendants was employed by WFIS and subject to an employment agreement.

149.    Each employee of WFIS's Pittsburgh branch office is also employed subject to an employment agreement of some variation

150.    Each of the Individual Defendants' agreements included some variation of a non-solicitation, non-compete, and/or non-disclosure covenant.

151.     Each of the Individual Defendants were under a contractual obligation to refrain from soliciting or inducing other WFIS employees to leave their employ and to refrain from soliciting any of the WFIS clients or customers they had serviced or had Confidential Information relating to.

152.     Defendant EPIC and each Individual Defendant had knowledge of WFIS's contractual relations with its employees, and of the duties of confidentiality, non-competition, and non-solicitation contained in the contracts, as well as fiduciary duties owed by such employees before and after their resignation from employment.

153.     Defendant EPIC and each Individual Defendant engaged in conduct to induce the breach of those contractual obligations, for the wrongful purpose of misappropriating WFIS's insurance clients and accounts.

154.     Having knowledge of the longstanding contractual relations WFIS has had with many of its accounts, and of the contractual expectancy WFIS has in those accounts, Defendants willfully engaged in wrongful conduct designed and intended to interfere with those contractual expectancies.

155.     There is no justification for Defendants' wrongful conduct.

156.     WFIS has been damaged by Defendants' tortious interference with its contractual relations and contractual expectancies, and by the loss of business revenue occasioned thereby, in an amount to be proven at trial.

157.     As a consequence of the foregoing, WFIS has suffered and will continue to suffer irreparable harm and damages.

## COUNT THREE - BREACH OF CONTRACT
### (AGAINST INDIVIDUAL DEFENDANTS ANDREAS, MENDELSON, YORIO, ZEWE, KRAUSS, KOSTORICK, AND KARSTENS)

158.    WFIS re-alleges and incorporates the preceding paragraphs by reference herein with the same force and effect as if set forth in full below.

159.    WFIS has fully complied with all of its obligations under each agreement held with the Andreas, Mendelson, Yorio, Zewe, Krauss, Kostorick, and Karstens.

160.    Andreas, Mendelson, Yorio, Zewe, Krauss, Kostorick, and Karstens have breached their respective written employment and non-solicitation agreements with WFIS (or its predecessor Acordia) by directly or indirectly assisting others in soliciting employees to leave WFIS and join EPIC to facilitate their competing business interests, and the interests of EPIC, prior to the voluntary termination of their employment relationships with WFIS.

161.    Andreas, Mendelson, Yorio, Zewe, Krauss, Kostorick, and Karstens have breached their respective written employment and non-solicitation agreements with WFIS (or its predecessor Acordia) by directly or indirectly assisting others in soliciting WFIS clients or customers to leave WFIS and join EPIC to facilitate their competing business interests, and the interests of EPIC, prior to the voluntary termination of their employment relationships with WFIS.

162.    WFIS has suffered damages and will continue to suffer damages as a result of the Andreas, Mendelson, Yorio, Zewe, Krauss, Kostorick, and Karstens' breaches in an amount to be specifically determined at trial.

163.    As a consequence of the foregoing, WFIS has suffered and will continue to suffer irreparable harm and damages.

## COUNT FOUR - BREACH OF FIDUCIARY DUTY AND/OR DUTY OF LOYALTY
### (AGAINST EACH INDIVIDUAL DEFENDANT)

164.    WFIS re-alleges and incorporates the preceding paragraphs by reference herein with the same force and effect as if set forth in full below.

165.    As trusted employees of WFIS's Pittsburgh office, the Individual Defendants occupied positions of trust and confidence.

166.    As an employee of WFSI, the Individual Defendants each agreed to be, and was in fact, bound by WFIS's policies, including its code of ethics and business conduct.

167.    By the acts and omissions described above, each of the Individual Defendants have breached the fiduciary duties they owed to WFIS as its employees, including the duties of loyalty, confidence and non-competition – all of which required the Individual Defendants to protect WFIS's interests.

168.    All Individual Defendants were prohibited from actively competing with WFIS during the tenure of their employment.

169.    Upon information and belief, each of the Individual Defendants, while still employed by WFIS, sought to compete with and to divert employees away from WFIS to themselves, and to EPIC.

170.    WFIS has been damaged by the Individual Defendants' breaches of fiduciary duty, and by the loss of business revenue occasioned thereby, in an amount to be proven at trial.

171.    As a consequence of the foregoing, WFIS has suffered and will continue to suffer irreparable harm and damages.

**COUNT FIVE – BREACH OF IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING
(AGAINST EACH INDIVIDUAL DEFENDANT)**

172.    WFIS re-alleges and incorporates the preceding paragraphs by reference herein with the same force and effect as if set forth in full below.

173.    Every contract entered into in Pennsylvania includes an implied covenant of good faith and fair dealing.

174.    By seeking to compete with WFIS in its specialty line insurance business by utilizing WFIS's confidential information to do so, Individual Defendants each breached the covenant of good faith and fair dealing contained in their respective contracts with WFIS.

175.    As a result of the breaches of implied covenant of good faith and fair dealing, WFIS has been damaged in an amount to be proven at trial.

176.    As a consequence of the foregoing, WFIS has suffered and will continue to suffer irreparable harm and damages.

**COUNT SIX - CIVIL CONSPIRACY
(AGAINST ALL DEFENDANTS)**

177.    WFIS re-alleges and incorporates the preceding paragraphs by reference herein with the same force and effect as if set forth in full below.

178.    The conduct of the Individual Defendants and EPIC, jointly and severally, constituted a civil conspiracy amongst them to engage in a concerted action for an illegal, unlawful and/or inappropriate purpose.

179.    Upon information and belief, EPIC acting in conjunction with and/or conspiracy with the Individual Defendants, pursued a common purpose to raid the WFIS

employees, solicit employees to leave WFIS employ, breach or tortiously interfere with the WFIS employee contracts in place, and intentionally damage WFIS's business interests.

180.    The Individual Defendants acting in conjunction with EPIC to purposely solicit and recruit specific employees to leave WFIS employ and join EPIC.

181.    As evidenced by the timing of the employee resignations, the Individual Defendants and EPIC acted with malice and intent to deprive WFIS of its lawful interest in its various agreements, and to significantly cause the Pittsburgh branch of WFIS financial damage.

182.    WFIS's business interests have been damaged by the civil conspiracy concocted by the Defendants, namely the instantaneous loss of 8 employees has resulted in an immediate and severe loss of over 50% of the business production coming out of this branch location.

183.    As a consequence of the foregoing, WFIS has suffered and will continue to suffer irreparable harm and damages.

## COUNT SEVEN – UNFAIR COMPETITION
### (AGAINST ALL DEFENDANTS)

184.    WFIS re-alleges and incorporates the foregoing paragraphs by reference herein with the same force and effect as if set forth in full below.

185.    Unfairly competing with WFIS, Defendants have engaged in a conspiracy to unlawfully divert, and have succeeded in unlawfully diverting, business away from WFIS for the benefit of EPIC using WFIS' Customer relationships, good will, and confidential information and by, among other things set forth above and incorporated herein, breaching, aiding or encouraging breaches of, and tortiously interfering with the Individual Defendants' fiduciary and contractual obligations to WFIS, in order to compete unfairly with WFIS in the highly competitive insurance

35

industry and secure, and continue to benefit from, an unfair competitive advantage not available to legitimate, lawful competitors in the industry.

186.    Upon information and belief, EPIC acting in conjunction with and/or conspiracy with the Individual Defendants, pursued a common purpose to raid the WFIS employees, solicit employees to leave WFIS employ, breach or tortiously interfere with the WFIS employee contracts in place, and intentionally damage WFIS's business interests.

187.    As evidenced by the timing of the employee resignations, the Individual Defendants and EPIC acted with malice and intent to deprive WFIS of its lawful interest in its various agreements, and to significantly cause the Pittsburgh branch of WFIS financial damage.

188.    WFIS's business interests have been damaged by the unfairly competitive scheme concocted by the Defendants, namely the instantaneous loss of 10 employees has resulted in an immediate and severe loss of over 50% of the business production coming out of this branch location.

## **PRAYER FOR RELIEF**

WHEREFORE, Wells Fargo Insurance Services USA, Inc. requests the Court enter judgment in favor of WFIS and against Defendants Sean Andreas, Zachary Mendelson, Charles Yorio, Phillip Wakim, Janice Zewe, Sally Krauss, Peter Kostorick, Kurt Karstens, and EPIC Insurance Consultants and Brokers as follows:

1.    Enjoin Defendants, Sean Andreas, Zachary Mendelson, Charles Yorio, Phillip Wakim, Janice Zewe, Sally Krauss, Peter Kostorick, Kurt Karstens, and EPIC Insurance Consultants and Brokers for a period running two (2) years from the date of its Order from directly

or indirectly soliciting or inducing any of WFIS's remaining employees to leave the employ of WFIS;

2.      Enjoin Individual Defendants for a period running two (2) years from the date of its Order, from violating the terms of their respective employment agreements, including:

(a) restraining or enjoining Individual Defendants from directly or indirectly soliciting, participating in or promoting the solicitation of any of WFIS's clients, customers, or prospective customers with whom Individual Defendants had Material Contact (as defined in their respective agreements);

(b)  restraining or enjoining Individual Defendants from directly or indirectly soliciting, participating in or promoting the solicitation of any of WFIS's clients, customers, or prospective customers with whom Individual Defendants received Confidential Information for the purpose of providing products or services that are in competition with WFIS's products or services;

(c) restraining or enjoining Individual Defendants from otherwise utilizing or disclosing trade secrets and other confidential and proprietary information of WFIS for any purpose other than that of conducting business on behalf of WFIS;

(d) restraining or enjoining Individual Defendants from otherwise engaging in any activity in breach of  the Individual Defendant's agreements with WFIS, including, but not limited to, the terms of the Agreement and/or the Code, including accepting insurance business from or provide Competitive Products/Services to customers or clients of WFIS.

3.      Judgment against each of the Defendants, Sean Andreas, Zachary Mendelson, Charles Yorio, Phillip Wakim, Janice Zewe, Sally Krauss, Peter Kostorick, Kurt Karstens, and EPIC Insurance Consultants and Brokers, for monetary damages suffered by WFIS as a result of Defendants' tortious interference, breaches of contract, breaches of fiduciary duty, breaches of

covenant of good faith and fair dealing, civil conspiracy and unfair competition, in an amount to be proven at trial.

4.      Award of punitive damages to punish the Defendants for their willful and malicious conduct in tortiously interfering with WFIS' contractual relationships.

5.      The establishment of a constructive trust in favor of WFIS.

6.      Award of damages or disgorgement in the amount that the Defendants have been unjustly enriched as a result of the Defendants' tortious conduct.

7.      Award of attorneys' fees and costs of litigation as contractually agreed upon, or otherwise permitted by law.

8.      Any such other relief as the Court deems necessary and proper at law or in equity.


 Dated:  October 4, 2017


                                        /s/        *Jarrod Shaw*
                                        Gerald **J.** Stubenhofer Jr**.**
                                        Pa. Id. No. 72921
                                        Jarrod Shaw
                                        Pa. Id. No. 93459
                                        Natali Zagari
                                        Pa. Id. No.
                                        McGuire Woods LLP
                                        Tower Two-Sixty
                                        260 Forbes Avenue, Suite 1800
                                        Pittsburgh, Pennsylvania 15222
                                        (412) 667-6000 (Telephone)
                                        (412) 667-6050 (Facsimile)
                                        jshaw@mcguirewoods.com

                                        *Counsel for Plaintiff Wells Fargo Insurance*
                                        *Services USA, Inc.*